IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JOSEPH NEEV,

Plaintiff,

v.

ABBOTT MEDICAL OPTICS INC.,

Defendant.

C.A. No. 09-146-RBK-JS

**PLAINTIFF JOSEPH NEEV'S OPENING *MARKMAN* BRIEF**

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 4

A. The State of the Art at the Time of Dr. Neev's Invention .......... 4

B. Person of Ordinary Skill in the Art .......... 5

C. Dr. Neev's Invention .......... 5

D. Reexamination Proceedings .......... 6

III. ARGUMENT .......... 7

A. Applicable Legal Principles .......... 7

1. The Court Construes Claims to Clarify Their Scope; Claim Construction Is Not an Exercise in Redundancy .......... 7

2. Claim Terms Mean What a Person of Ordinary Skill in the Art Would Understand Them to Mean .......... 7

3. Claim Terms Are Construed by First Looking to Their Plain Meaning, Then, if Necessary, to the Intrinsic Evidence, and Then, Rarely, to Extrinsic Evidence .......... 8

B. Agreed Constructions .......... 10

C. Disputed Constructions .......... 11

1. "operating the source and manipulating the beam parameters" (Claims 1, 20, 21, 23, 80, 81, 82, 83) .......... 11

2. "manipulating beam parameters" (Claims 1, 20, 21, 23, 80-83); "manipulating parameters of the beam" (Claim 5); "adjusting characteristics of the electromagnetic radiation beam" (Claims 85, 86); "varying at least one of the following beam parameters" (Claims 1, 80-83) .......... 12

3. "interaction energy transients" (Claims 1, 80-83, 85, 86) .......... 12

4. "preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region" (Claim 1) ............ 13

5. "material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation" (Claim 5 Preamble) ............ 15

6. "allowing interaction energy transients caused by the electromagnetic pulses to substantially decay so that material modification is effected" (Claims 1, 80-83); "allow interaction energy transients caused by the pulsed electromagnetic radiation beam to decay sufficiently such that the material can be modified" (Claims 85, 86) ............ 17

7. "cumulative residual thermal energy left in the material by a pulse train" (Claim 5) ............ 18

D. Claim Terms That Do Not Require Construction ............ 19

1. "controlled, variable rate material modification" (Claims 1, 80-83); "highly controllable, variable rate material removal" (Claim 5 Preamble) ............ 19

2. "target material" (Claims 1, 5, 10, 12, 53, 61, 67, 71, 80-83, 85, 86) ............ 20

3. "target region" (Claims 1, 2, 25, 51, 53, 61, 67, 71, 80-83, 85, 86) ............ 20

4. "operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified" (Claims 1, 80-83) ............ 21

5. "continuously emitted electromagnetic radiation" (Claim 5) ............ 22

6. "material ablation" (Claim 5) ............ 22

7. "redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses" (Claim 5) ............ 23

8. "plasma" (Claims 21, 22, 25, 80) ............ 23

IV. CONCLUSION ............ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Sys., Inc. and Laserscope v. Biolitec, Inc.*,
618 F.3d 1354 (Fed. Cir. 2010)........................................................................ 15

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
246 F.3d 1368 (Fed. Cir. 2001)........................................................................ 15

*Callicrate v. Wadsworth Mfg., Inc.*,
427 F.3d 1361 (Fed. Cir. 2005)........................................................................ 14

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com Inc.*,
289 F.3d 801 (Fed. Cir. 2002)...................................................................... 15, 20

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)........................................................................ 24

*Chimie v. PPG Indus., Inc.*,
402 F.3d 1371 (Fed. Cir. 2005).......................................................................... 9

*DSW Inc. v. Shoe Pavilion Inc.*,
537 F.3d 1342 (Fed. Cir. 2008).......................................................................... 8

*Epistar Corp. v. ITC*,
566 F.3d 1321 (Fed. Cir. 2009).......................................................................... 8

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)................................................................... 7, 20, 22

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007)..................................................................... 8, 14

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
215 F.3d 1281 (Fed. Cir. 2000).......................................................................... 8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008).......................................................................... 7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)................................................................... passim

*Pods, Inc. v. Porta Stor, Inc.*,
484 F.3d 1359 (Fed. Cir. 2007)........................................................................ 14

*Schindler Elevator Corp. v. Otis Elevator Co.*,
593 F.3d 1275 (Fed. Cir. 2010)........................................................................... 9

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
594 F.3d 1360 (Fed. Cir. 2010)........................................................................... 9

*Std. Oil Co. v. Am. Cyanamid Co.*,
774 F.2d 448 (Fed. Cir. 1985)............................................................................. 5

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997)...................................................................... 7, 13

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)................................................................ 20, 21, 22

Pursuant to the December 1, 2010 Scheduling Order, as modified on April 19, 2011, Plaintiff JOSEPH NEEV ("Dr. Neev") hereby submits this Opening *Markman* Brief in support of his proposed constructions of claims of U.S. Patent No. 6,482,199 ("'199 patent").

## I. INTRODUCTION

The '199 patent covers material modification and processing using pulsed electromagnetic energy having ultrashort pulse durations in order to minimize collateral damage to regions of the material surrounding a targeted region. By minimizing collateral damage to the surrounding material regions, precise and controlled material modification may be achieved. The '199 patent includes 86 claims, 70 of which were added during a reexamination proceeding in the U.S. Patent and Trademark Office ("PTO") that concluded in late 2010.

Dr. Neev accuses Defendant ABBOTT MEDICAL OPTICS INC. ("AMO") of infringing claims 1, 2, 5-7, 10-15, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, 80-83, 85, and 86 of the '199 patent by selling and offering to sell the IntraLase FS device, which is used for LASIK eye surgery. The IntraLase FS device is used to cut the corneal flap. That flap is then folded back and a different type of laser does the vision correction. The flap is folded back and heals. The IntraLase FS device competes with a small metal scalpel known as a microkeratome. Advertisements for "All Laser LASIK" are for LASIK using AMO's IntraLase FS device. AMO dominates the market for all laser LASIK surgery.

The parties dispute several terms of the asserted patent claims. Dr. Neev's proposed constructions, which are the only constructions supported by the claim language and patent specification, clarify the meaning of the claim terms. On the other hand, AMO's proposed constructions, which find little or no support in the patent specification and claim language, obfuscate instead of clarify the meaning of the claim terms. AMO's proposed constructions also

impermissibly add limitations to the claim terms that are not supported by the claim language or patent specification.

For example, the parties dispute the construction of "material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation," which appears only in the preamble of claim 5. Under controlling authority, because this term appears in only the claim's preamble and does not give life, meaning, and vitality to claim 5, the body of which describes a complete invention, it should not be construed. AMO, on the other hand, contends that this preamble phrase limits the claim, even though language in the claim itself and the patent specification demonstrate the exact opposite.

In total, the parties dispute construction of the following seven sets of claim terms: (1) "operating the source and manipulating the beam parameters" (claims 1, 20, 21, 23, 80, 81, 82, 83); (2) "manipulating beam parameters" (claims 1, 20, 21, 23, 80-83), "manipulating parameters of the beam" (claim 5), "adjusting characteristics of the electromagnetic radiation beam" (claims 85, 86), "varying at least one of the following beam parameters" (claims 1, 80-83); (3) "interaction energy transients" (claims 1, 80-83, 85, 86); (4) "preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region" (claim 1); (5) "material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation" (claim 5 preamble); (6) "allowing interaction energy transients caused by the electromagnetic pulses to substantially decay so that material modification is effected" (claims 1, 80-83), "allow interaction energy transients caused by the pulsed electromagnetic radiation beam

to decay sufficiently such that the material can be modified" (claims 85, 86); and (7) "cumulative residual thermal energy left in the material by a pulse train" (claim 5).[1]

The parties have agreed on constructions for the following seven sets of claim terms: (1) "[modification] threshold volumetric power density" (claims 1, 80-83); (2) "power density threshold for material ablation" (claim 5); (3) "deposited volumetric power density" (claims 1, 80-83); (4) "power densities within the region targeted for modification" (claim 5); (5) "commutative ablation" (claim 5); (6) "absorption characteristic of the material … at the target region" (claims 1, 80-83), "absorption of the target region" (claims 85, 86); and (7) "scattering characteristic of the material at the target region" (claims 1, 80-83), "scattering of the target region" (claims 85, 86).[2] Moreover, Dr. Neev believes that the following eight sets of unambiguous claim terms do not require construction because their plain, ordinary meanings are clear to a person of ordinary skill in the art: (1) "controlled, variable rate material modification" (claims 1, 80-83), "highly controllable, variable rate material removal" (claim 5 preamble); (2) "target material" (claims 1, 5, 10, 12, 53, 61, 67, 71, 80-83, 85, 86); (3) "target region" (claims 1, 2, 25, 51, 53, 61, 67, 71, 80-83, 85, 86); (4) "operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified" (claims 1, 80-83); (5) "continuously emitted electromagnetic radiation" (claim 5); (6) "material ablation" (claim 5); (7) "redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses" (claim 5); and (8) "plasma" (claims 21, 22, 25, 80).

---

[1] Claim numbers referred to throughout this brief are those in which the particular claim term is recited.

[2] The parties agreed on constructions for sets 6 and 7 subsequent to the filing of the Joint Claim Construction and Prehearing Statement.

Dr. Neev respectfully requests that the Court enter the parties' agreed constructions, enter Dr. Neev's proposed constructions for the disputed claim terms, and rule that the plain, ordinary meanings apply to the remaining terms that AMO seeks to construe.

## II. BACKGROUND

### A. The State of the Art at the Time of Dr. Neev's Invention

Dr. Neev's invention is generally related to laser-tissue interactions, and more specifically to the field of electromagnetic energy systems for material and biological tissue modification processing and removal. At the time of the invention, research in this field was directed to enhancing material removal by increasing the power of the electromagnetic energy or by increasing the intensity of individual pulses of electromagnetic energy. (*See* '199 patent at 2:25-28.) However, the electromagnetic energy or laser systems in use at the time caused collateral damage to areas around a target region, plasma decoupling of the beam, and loud acoustic snaps. (*Id.* at 2:25-39.) Other systems and methods in use at the time of the invention, such as excimer laser systems, suffered from a rate of tissue modification per pulse that was very low and required operating the system at high repetition rates. (*Id.* at 3:37-47.) However, the high repetition rates resulted in considerable and unintended thermal and mechanical collateral damage to areas around a target region. (*Id.* at 3:48-50.)

At the time of the invention, researchers were investigating the interaction of picosecond and femtosecond pulses and tissue to provide a system that would reduce the collateral damage provided by state of the art systems. The interaction of picosecond and femtosecond laser pulses and biological tissue at the time of the invention was unique and understood by those skilled in the art to provide advantages over the state of the art systems when properly controlled and administered. (*Id.* at 4:20-25.)

However, at the time of the invention, the availability of picosecond and femtosecond laser sources was limited to relatively few institutions such as national laboratories and leading academic universities. (*Id.* at 4:40-44.) The sources and systems that used them were delicate and required expert maintenance. (*Id.* at 4:44-46.) The ultrashort pulses required special delivery optics and delivery systems. (*Id.* at 4:50-58.) And, the ultrashort pulse systems required expert monitoring as the ablation was not selective. (*Id.* at 4:46-50.) Moreover, at the time of the invention, ultrashort pulse laser were achieved in the near-infrared region of the electromagnetic spectrum (wavelengths of about 750nm - 1400nm) which is transparent for most biotissue, and thus, results in the propagation of at least a portion of the ultrashort pulses into the biotissue, resulting in further collateral damage below a surface of a target region. (*Id.* at 4:59-5:2.) Consequently, at the time of Dr. Neev's invention, there was a need for a material modification regime that minimized collateral damage and maximized precision.

**B. Person of Ordinary Skill in the Art**

A person of ordinary skill in the art at the time of the invention would have had a Bachelor of Science degree in physics and three to five years of experience designing processes and procedures using lasers to modify tissue.[3]

**C. Dr. Neev's Invention**

In view of the state of the art at the time of his invention, Dr. Neev recognized that ultrashort pulse laser systems provided improved precision in material and biological tissue modification. However, Dr. Neev also understood that such ultrashort pulse laser systems were expensive, and thus, only found limited institutions. Consequently, Dr. Neev sought to develop a

[3] *See Std. Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) ("A person of ordinary skill in the art is . . . presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which.").

method for material modification that allows the use of not only ultrashort pulse laser systems, but also systems that have pulse durations of up to several milliseconds long, while still maintaining the improved precision afforded by the ultrashort pulse laser systems. (*See* '199 patent at 5:38-55.) In particular, Dr. Neev understood that the multiple pulse interactions occurring through the irradiation of pulses of any duration on the target results in the accumulation over time of energy transients including heat energy. The accumulation over time of these energy transients results in unintended collateral damage of the material and uncontrolled material modification. (*Id.* at 40:13-24.) Dr. Neev understood that a pulse regime that allowed an energy transient to substantially decay before introducing additional energy transients would minimize the collateral damage that could occur through temporal accumulation of the energy transients, and thus, permit controlled material modification at pulse durations from about 1 femtosecond to about 0.1 millisecond. (*Id.* at 40:13-24, 44:10-15, 71:5-32.)

Moreover, Dr. Neev developed a parameter regime of material modification wherein the residual thermal energy deposited by the pulses could be removed by the combined effect of successive pulses. In particular, Dr. Neev understood that when operating according to this material modification regime, the cumulative modification of the material would actually remove the cumulative residual thermal energy left in the material by the pulses, permitting the use of high repetition rate lasers. (*Id.* at 35:53-60.) Consequently, Dr. Neev proposed a material modification regime that minimizes collateral damage to the material, thus providing precise and controlled material modification. (*Id.*)

**D. Reexamination Proceedings**

In 2009, Neev filed the present action for infringement. On October 28, 2009, AMO filed a Request for *Ex Parte* Reexamination in the PTO requesting the reexamination of claims 1 and 2 of the '199 patent. Following conclusion of the reexamination proceedings, the PTO issued a

Reexamination Certificate on October 26, 2010, confirming the patentability of amended claims 1 and 2 and new claims 17-86.

## III. ARGUMENT

### A. Applicable Legal Principles

#### 1. The Court Construes Claims to Clarify Their Scope; Claim Construction Is Not an Exercise in Redundancy

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1999)). Claim construction is a matter of law for the Court. *Id.* (citing *Markman*, 52 F.3d at 979). When the scope of a claim is actually in dispute, the Court must resolve the dispute by construing the claims. *Id.*

Only terms whose meanings are legitimately in dispute need to be construed. *See id.* at 1362. The Court "is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word" in the claim. *Id.* at 1360 n.2. Claim construction "is not an obligatory exercise in redundancy"; it is meant "to clarify and when necessary explain what the patentee covered by the claims, for use in the determination of infringement." *Id.* at 1362 (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

#### 2. Claim Terms Mean What a Person of Ordinary Skill in the Art Would Understand Them to Mean

The terms of a claim "are generally given their ordinary and customary meaning"; i.e., they mean what a person of ordinary skill in the art would understand them to mean at the time of invention, when read in the context of the intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). "In some cases, the ordinary meaning of claim

language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In other cases, however, the claim language may have a particular meaning in the relevant field of art. *Id.*

#### 3. Claim Terms Are Construed by First Looking to Their Plain Meaning, Then, if Necessary, to the Intrinsic Evidence, and Then, Rarely, to Extrinsic Evidence

The intrinsic evidence, i.e., the patent specification (including the claims themselves) and prosecution history, is the most significant evidence in determining the "legally operative meaning of claim language." *Id.* at 1317. The patent specification is "the single best guide to the meaning of a disputed term." *Id.* at 1315. The prosecution history is less useful, being a record of the "ongoing negotiation between the PTO and the applicant" rather than the final product of that negotiation. *Id.* at 1317.

The claim itself "provides substantial guidance" in construing a claim term. *Id.* In fact, "absent contravening evidence from the specification or prosecution history, plain and unambiguous claim language controls the construction analysis." *DSW Inc. v. Shoe Pavilion Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008) (citing *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1295 (Fed. Cir. 2000)). Construing a claim term as less than its "full ordinary and customary meaning" requires a showing that the applicant clearly and expressly relinquished claim scope. *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009).

Further, the description of the invention is important in construing claims. Claims should be construed to include the embodiments of the invention described in the specification. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."). Indeed, construing a claim term to exclude a described embodiment requires "highly

persuasive evidentiary support." *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1369 (Fed. Cir. 2010) (quoting *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005)).

The prosecution history, although lacking the clarity of the specification, may be useful in determining how the applicant represented the claim to the PTO. *Phillips*, 415 F.3d at 1317. For example, the prosecution history may reveal that the applicant limited the scope of the claim, making it narrower than it would be otherwise. *Id.* Such disavowal or disclaimer of a claim scope, however, must be unequivocal—it must be "***clear and unmistakable***." *Schindler Elevator Corp. v. Otis Elevator Co.*, 593 F.3d 1275, 1285 (Fed. Cir. 2010) (emphasis added).

The intrinsic evidence may be supplemented with supporting extrinsic evidence, i.e., evidence outside of the specification and prosecution history. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is less reliable than the intrinsic evidence and should not be considered outside the context of the intrinsic evidence. *Id.* at 1319. For example, when the ordinary meaning of a claim term as understood by a person of ordinary skill in the art is readily apparent to a lay person, a general purpose dictionary may be helpful to determine and apply the widely accepted meaning of that term. *Id.* at 1314. In contrast, extrinsic evidence that contradicts the intrinsic evidence should be disregarded. *Id.* at 1318.

### B. Agreed Constructions

The parties agree that the following claim terms should be construed in the following manner:

| Claim Term | Claim(s) | Agreed Construction |
|---|---|---|
| "[modification] threshold volumetric power density" | 1, 80-83 | The minimum energy per unit time per unit volume necessary for material modification. |
| "power density threshold for material ablation" | 5 | |
| "deposited volumetric power density" | 1, 80-83 | Deposited energy per unit time per unit volume. |
| "power densities within the region targeted for modification" | 5 | |
| "commutative ablation" | 5 | The combined effect of successive ablation. |
| "absorption characteristic of the material … at the target region" | 1, 80-83 | A characteristic of the target material that determines the absorption of the electromagnetic energy by the target material at the target region. |
| "absorption of the target region" | 85, 86 | |
| "scattering characteristic of the material at the target region" | 1, 80-83 | A characteristic of the target material that determines the scattering of the electromagnetic energy by the target material at the target region. |
| "scattering of the target region" | 85, 86 | |

### C. Disputed Constructions

#### 1. "operating the source and manipulating the beam parameters" (Claims 1, 20, 21, 23, 80, 81, 82, 83)

The only correct construction of this term is "operating the source and setting or adjusting the beam parameters prior to or during the operation of the source." For example, the patent specification states, "This exemplary laser system 380 of the present invention is thus able to produce a continuously tunable output by changes in optics and adjustments." ('199 patent at 48:43-45 (emphasis added).) Accordingly, the intrinsic evidence makes clear that the beam parameters are continuously tunable, and thus, can be manipulated at any time before, during, or after operation of the pulse source.

AMO's proposed construction is "varying the wavelength, energy, power, spot size, focal volume, duration, or repetition rate of an electromagnetic beam while irradiating the target material." AMO's proposed construction is incorrect for at least the following reasons.

First, AMO's proposed construction is redundant and unnecessary. Specifically, it includes limitations that are already present in the claim language itself. Indeed, claim 1 recites "varying at least one of the following beam parameters: a beam spot size at the target region, a duration of the electromagnetic pulses, an energy of the electromagnetic pulses, or a wavelength of the electromagnetic pulses."

Second, AMO's proposed construction limits the varying step as occurring only while the target material is being irradiated. This construction is inconsistent with the intrinsic evidence. As discussed above, the intrinsic evidence indicates that the beam parameters can be manipulated at any time before, during, or after the pulse source is operated. The patent specification does not place any temporal limitation on manipulation of the beam parameters. AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope.

Accordingly, Dr. Neev's proposed construction should be adopted.

**2. "manipulating beam parameters" (Claims 1, 20, 21, 23, 80-83); "manipulating parameters of the beam" (Claim 5); "adjusting characteristics of the electromagnetic radiation beam" (Claims 85, 86); "varying at least one of the following beam parameters" (Claims 1, 80-83)**

This set of claim terms contains an element ("manipulating beam parameters" and similar phrases) found in the claim term ("operating the source and manipulating the beam parameters") discussed in the immediately preceding section. For at least the reasons stated in the immediately preceding section, the only correct construction of this set of claim terms is "setting or adjusting the beam parameters prior to or during the operation of the source." As discussed above, the patent specification does not place any temporal limitation on manipulation of the beam parameters, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. Accordingly, Dr. Neev's proposed construction should be adopted.

**3. "interaction energy transients" (Claims 1, 80-83, 85, 86)**

The only correct construction of this term is "energy transients in the target material that are created by interaction of electromagnetic radiation with the target material." For example, the patent specification describes the interaction energy transients as "[w]hen the energy $E_{inc}$ from a single pulse impinges on the material, much of the material may experience transient effects of the incoming energy." ('199 patent at 58:12-14.) Thus, the intrinsic evidence makes clear that "interaction energy transients" are energy transients in the target material that are created by interaction of electromagnetic radiation with the target material.

Instead of clarifying this term, AMO's proposed construction obfuscates it. AMO's proposed construction is "a temporary state of matter, other than plasma, that is initiated by the interaction of electromagnetic beam energy with the target." AMO's proposed construction is incorrect for at least the following reasons.

First, a person of ordinary skill in the art knows that energy is not a "state of matter." Indeed, although AMO cites to the patent specification as support for AMO's proposed construction, the patent specification nowhere describes energy or energy transients as a "state of matter."

Second, AMO's proposed construction includes an incorrect statement that obfuscates rather than clarifies the meaning of this term. AMO's proposed construction states, "Interaction energy transients would normally include plasma, but in the application for the patent Neev disclaimed plasma from interaction energy transients." As discussed above, a person of ordinary skill in the art knows that energy is not a "state of matter." Accordingly, "plasma," which AMO considers to be a state of matter (*see infra* section III.D.8.), also is not energy or an energy transient. Moreover, because AMO's incorrect, superfluous statement in no way clarifies the meaning of this term, it must be rejected. *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

Accordingly, Dr. Neev's proposed construction should be adopted.

**4. "preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region" (Claim 1)**

The only correct construction of this term is "altering the absorption or scattering characteristics of the target region of the target material in time or space, prior to irradiating the region with the electromagnetic pulses."[4] For example, the patent specification provides,

[4] Note that for part of this claim phrase ("an absorption characteristic of the material or a scattering characteristic of the material at the target region"), the parties agree on constructions. (*See supra* section III.B.) To the extent these same terms are construed as part of the phrase,

"[S]cattering and/or absorption centers, defects, or highly absorbing components are added to the target material with spatial and/or temporal selectivity to specific, predetermined locations within the target material." ('199 patent at 10:21-25; *see also id.* at 9:31-35, 20:7-12, 38:63-39:9, 41:40-61, 42:46:57, 43:56-65, 45:22-33.)

AMO's proposed construction is "changing the absorption or scattering characteristics of the target region by introducing a substance, such as a doping agent." AMO's proposed construction adds a limitation on how the absorption or scattering characteristics are altered or changed. Such a limitation, which is found nowhere in the language of claim 1, would exclude many embodiments described in the patent specification, contrary to patent law. *See MBO Labs., Inc.*, 474 F.3d at 1333 ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."). While the patent specification does include examples of preparing the target region by spatially or temporally varying an absorption or scattering characteristic using a doping agent (*see, e.g.*, '199 patent at 19:41-53, 40:46-55), the use of a doping agent is just one embodiment of many described throughout the patent (*see, e.g.*, *id.* at 19:41-53, 20:7-12, 40:46-55, 41:40-48, 42:24-33 and 45:22-29). Moreover, AMO's proposed construction improperly imports a limitation from the specification. *See Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005) ("While claims are indeed to be construed in light of the specification . . . the district court in this case improperly imported limitations from the specification into the claims, thereby restricting the claims to coverage of a

---

"preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region," they should be construed consistently with the parties' agreed constructions. *See Pods, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007) (applying a "presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims").

single embodiment.”). AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope.

Accordingly, Dr. Neev’s proposed construction should be adopted.

**5. “material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation” (Claim 5 Preamble)**

The phrase “material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation” appears *only* in the preamble of claim 5. No construction of this phrase is appropriate or necessary.

Unless a preamble is “necessary to give life, meaning, and vitality” to a claim, it does not define claim scope and so is not construed. *Am. Med. Sys., Inc. and Laserscope v. Biolitec, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010). A preamble is not limiting where, as here, “a patentee defines a . . . complete invention in the claim body.” *Catalina Mktg. Int’l, Inc. v. Coolsavings.com Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

For at least the following reasons, this preamble phrase is not limiting. This preamble phrase does not give life, meaning, or vitality to claim 5. Indeed, it is not repeated in the body of claim 5 and thus does not provide any antecedent basis or reference point for terms in the body of the claim. Moreover, this preamble phrase is not essential to understanding the invention described in the body of claim 5. The body of claim 5 recites six steps, designated a through f, that describe a complete invention. At best, this preamble phrase states an intended purpose of the complete invention recited in steps a through f: “high precision, highly controllable, variable rate, material removal.” Such a statement of intended purpose in the preamble does not limit the claim. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001) (affirming the district court’s decision that a preamble that “merely express[ed] a purpose” for a method claim was not limiting).

If this preamble phrase were properly determined to be limiting (which it should not be), it should be construed to mean "material removal by a process in which continuous wave of electromagnetic radiation is redistributed into pulses which interact with the material to remove the material." This is the only construction supported by the language of the body of claim 5 and the patent specification.

First, the claim language supports only Dr. Neev's construction. For example, the invention described in the body of claim 5 recites the steps of "redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses," "directing said modified beam(s) so that their energy distribution at any given location on the target material forms a sequence of electromagnetic pulses," and "operating said source and manipulating parameters of the beam so that the electromagnetic pulse's power densities … are larger than a power density threshold for material ablation." As this claim language makes clear, the beam is redistributed in time and space to form pulses that interact with the material to ablate the material. AMO's proposed construction requires that the material removal is by "a beam that operates without any intervening period of zero power as it interacts with the material." AMO's proposed construction is thus contrary to the language in the body of claim 5—language that properly defines the scope of the patented invention.

Second, the patent specification supports only Dr. Neev's construction. For example, the specification states, "410 is a solid state pulsed system which is pumped by a CW or Quasi-CW laser source" ('199 patent at 49:5-7), "[t]he system 429 consists of a CW electromagnetic source 422 … [s]uch source 422 output may then be temporally and spatially modified in an output modifying device 424 to produce a pulsed output" (*id*. at 49:37-39), and "[u]sing a Continuously Emitting CW source and dividing the CW energy 440 (see FIG. 8d) into several beamlets of

duration t characterized by a certain pulse repetition rate (for example 444 and 445 respectively, in FIG. 8d) which are then either directly or through fiber/hollow waveguide delivered to the target, carries some additional advantages" (*id*. at 52:56-61). (*See also id.* at 11:45-54, 12:10-25.) Thus, the patent specification makes clear that the material removal is a result of a process in which continuous wave electromagnetic radiation is redistributed into pulses which interact with the material to remove the material. The specification in no way supports AMO's proposed construction. The specification does not support material removal by the interaction of a beam that operates without any intervening period of zero power as it interacts with the material. In fact, it describes the exact opposite. (*See, e.g.*, *id.* at 50:34-44 and FIG. 8d (describing and showing that the pulses of the modified CW beam have intervening periods of zero power at the particular target location).)

AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. Accordingly, if this preamble phrase is construed (which it should not be), Dr. Neev's proposed construction should be adopted.

**6. "allowing interaction energy transients caused by the electromagnetic pulses to substantially decay so that material modification is effected" (Claims 1, 80-83); "allow interaction energy transients caused by the pulsed electromagnetic radiation beam to decay sufficiently such that the material can be modified" (Claims 85, 86)**

The only correct construction of these terms is "allow[ing] energy transients in the target material that are created by interaction of electromagnetic radiation with the target material and caused by the electromagnetic pulses incident on the target material to substantially decay such that the material is modified." When substituting this correct construction into the claims, it is clear from the claim language that this step of allowing interaction energy transients to substantially decay "permit[s] the controlled, variable rate material modification." Indeed, as

discussed in section II.C. above, this step of allowing the interaction energy transients to decay to prevent the accumulation over time of significant transient energy, permits controlled material modification by minimizing collateral damage. (*See* '199 patent at 40:13-24, 44:10-16, 71:5-32.)

AMO's proposed construction of these terms is "allow[ing] the decay, via the passage of time, of an interaction energy transient … so that the material is modified." AMO's proposed construction implies that the interaction energy transient decay *causes* the material modification. This is not consistent with the intrinsic evidence. Indeed, the patent specification makes clear that the material modification is not caused by the interaction energy transient decay, but rather that collateral damage is minimized by allowing interaction energy transient decay thus permitting controlled material modification. (*See, e.g.*, '199 patent at 40:13-24, 44:10-16.)

Further, AMO's proposed construction improperly adds the limitations "caused by the delivery of a single electromagnetic pulse to the target region, prior to subsequent irradiation." In other words, AMO attempts to limit the claim to the decay of energy from a single pulse prior to subsequent irradiation. These limitations are not supported by the intrinsic evidence, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. Nor do these limitations clarify the meaning of these terms.

Accordingly, Dr. Neev's proposed construction should be adopted.

**7. "cumulative residual thermal energy left in the material by a pulse train" (Claim 5)**

The only correct construction for this term is "remaining accumulated thermal energy left in the target material by a pulse train." For example, the patent specification states, "Such electromagnetic energy absorption is repeated, as desired so that ablation and energy removal occurs at a pulse repetition rate greater than 0.1 pulses per second, such that substantially most of the cumulative residual thermal energy left in the material by a pulse train is removed by the

cumulative ablation." ('199 patent at 11:66-12:4; *see also id.* at 18:65-19:7, 37:9-20, 38:7-17, 53:3-16, 53:46-62.)

AMO's proposed construction is "the residual thermal energy that builds up at a particular target region in the target material after multiple exposures of EM radiation by the pulse train each depositing a certain amount of residual thermal energy." AMO's construction does not add clarity. Instead, it adds unwarranted limitations. First, even though this claim term nowhere refers to a "target material" (it refers only to a "target region") AMO's proposed construction improperly limits the location of the "residual thermal energy" to "a particular target region in the target material." Second, AMO's construction improperly adds the limitation that the "residual thermal energy" requires "multiple exposures of EM radiation" when, in fact, even a single pulse or exposure of electromagnetic radiation may result in thermal energy remaining in the target material (*see, e.g.*, '199 patent at 34:39-45, 35:19-24, 35:31-41). These limitations are not supported by the intrinsic evidence, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope.

Accordingly, Dr. Neev's proposed construction should be adopted.

**D. Claim Terms That Do Not Require Construction**

**1. "controlled, variable rate material modification" (Claims 1, 80-83); "highly controllable, variable rate material removal" (Claim 5 Preamble)**

These terms do not require construction because their plain, ordinary meaning is clear to a person of ordinary skill in the art, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. AMO proposes construing these terms as "a process by which material is modified or removed at a variable rate by manipulating the beam parameters while irradiating the target material." AMO's proposed construction is not supported by the intrinsic evidence, and by seeking to import limitations not found in the claims, is wholly

improper. *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'") (citation omitted); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). Moreover, since "highly controllable, variable rate material removal" is recited in only the preamble of claim 5—a claim whose body describes a complete invention—this term is not properly construed as a limitation. *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 808. Accordingly, these terms' plain, ordinary meanings should be applied.

**2. "target material" (Claims 1, 5, 10, 12, 53, 61, 67, 71, 80-83, 85, 86)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art. AMO proposes construing this term as "the entire object targeted for modification (e.g., tooth, cornea)." This is contrary to the plain, ordinary meaning of the claim term. A person of ordinary skill in the art would understand that "object" and "material" are distinct. For example, a tooth, an object identified by AMO, comprises different materials, such as dentin and enamel. Similarly, the cornea identified by AMO is one material of an eye, the object. Thus, AMO's proposed construction not only is unnecessary but confusing. Accordingly, this term's plain, ordinary meaning should be applied.

**3. "target region" (Claims 1, 2, 25, 51, 53, 61, 67, 71, 80-83, 85, 86)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art. AMO proposes construing this term as "the specific, fixed location in the target material that is intended for modification by the electromagnetic beam." AMO's proposed construction is not supported by the intrinsic evidence, and by seeking to

import limitations not found in the claims, is wholly improper. *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'") (citation omitted); *Vitronics Corp.*, 90 F.3d at 1582 ("we look to the words of the claims themselves . . . to define the scope of the patented invention"). Accordingly, this term's plain, ordinary meaning should be applied.

**4. "operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified" (Claims 1, 80-83)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. AMO's proposed construction adds the limitation of "firing multiple electromagnetic pulses … at the same target region." For at least the following reasons, AMO's construction is improper.

First, this construction is inconsistent with the intrinsic evidence. For example, under AMO's proposed construction, a single electromagnetic pulse cannot modify a target volume in a target region. However, a person of ordinary skill in the art would understand that each pulse has the potential to provide some material modification. Indeed, this is supported by the patent specification which states, "Once the electromagnetic pulse arrives at the target medium, more substantial energy deposition is accomplished through the interaction of the radiation with the media atoms and electrons. The interaction can be relatively weak in which case substantial amounts of energy are transported through the target material . . . ." ('199 patent at 21:2-7.) At the very least, this interaction and transport of energy from even a single pulse can modify target material. Consequently, the source does not require the firing of <u>multiple</u> pulses.

Second, AMO's proposed construction attempts to import a limitation that the "pulses" must be fired at the <u>same</u> target region. AMO's proposed construction is not supported by the

intrinsic evidence, and by seeking to import limitations not found in the claims, is wholly improper. *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude'") (citation omitted); *Vitronics Corp.*, 90 F.3d at 1582 ("we look to the words of the claims themselves . . . to define the scope of the patented invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.").

Accordingly, this term's plain, ordinary meaning should be applied.

**5. "continuously emitted electromagnetic radiation" (Claim 5)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. AMO's proposed construction adds the limitation of "without any intervening period of zero power." In support, AMO points to two sections of the patent specification (49:5-16 and 27-41). Neither supports AMO's proposed construction. In fact, the limitation that AMO is attempting to inject ("without any intervening period of zero power") is found <u>nowhere</u> in the patent specification. Accordingly, this term's plain, ordinary meaning should be applied.

**6. "material ablation" (Claim 5)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. AMO's proposed construction adds the limitations of "complete material disintegration and explosive ejection of the target volume." By attempting to define the simple term "material ablation" as requiring not only complete disintegration, but also explosive ejection, AMO's proposed construction not only adds

limitations not found in the claim, but makes the term ambiguous (what constitutes "complete" disintegration and "explosive" ejection?). Moreover, AMO's proposed construction is contrary to the intrinsic evidence, which distinguishes "disintegration" from "ablation." (*See, e.g.,* '199 patent at 10:11-14, 77:44-51.) Accordingly, this term's plain, ordinary meaning should be applied.

**7. "redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses" (Claim 5)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art, and AMO cannot meet its burden of showing that Dr. Neev clearly and expressly relinquished claim scope. AMO's proposed construction is "[p]artitioning the continuous wave beam to separate physical locations in the material for specific time periods with each period creating a 'pulse effect' in the 'modified beam' at that physical location, without changing the characteristics of the continuous wave beam of electromagnetic radiation." Not only does AMO's proposed construction improperly add several limitations not supported by the claim language, it obfuscates, rather than clarifies, the meaning of the term. Moreover, AMO's proposed construction introduces terms ("pulse effect" and "modified beam") that may themselves require construction. Accordingly, this term's plain, ordinary meaning should be applied.

**8. "plasma" (Claims 21, 22, 25, 80)**

This term does not require construction because its plain, ordinary meaning is clear to a person of ordinary skill in the art. AMO's proposed construction, with no supporting evidence identified, is "a state of matter similar to gas in which a certain portion of the particles is ionized." Again, rather than construe the claim that is written, AMO is attempting to rewrite the claim and narrow its scope. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1375 (Fed.

Cir. 2004) ("[W]e have repeatedly declined to rewrite unambiguous patent claim language ...."). Accordingly, this term's plain, ordinary meaning should be applied.

## IV. CONCLUSION

For the foregoing reasons, Dr. Neev respectfully requests that the Court enter the parties' agreed constructions, enter Dr. Neev's proposed constructions for the disputed claim terms, and rule that the plain, ordinary meanings apply to the remaining terms that AMO seeks to construe.

Dated: August 23, 2011

*<u>/s/ Mary B. Matterer</u>*

Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
mmatterer@morrisjames.com

*Attorneys for Plaintiff, Joseph Neev*