## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOSEPH NEEV, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 09-146-RBK-JS |
| | ) |
| ABBOTT MEDICAL OPTICS INC. | )   **JURY TRIAL DEMANDED** |
| Defendant. | ) |

## DEFENDANT ABBOTT MEDICAL OPTICS INC.'S OPENING MARKMAN BRIEF

OF COUNSEL:

A. James Isbester
David B. Perry
Jessica L. Hannah
KILPATRICK TOWNSEND
  & STOCKTON LLP
Two Embarcadero Center, Eighth Floor
San Francisco, CA 94111
Tel: (415) 576-0200

Dated: August 23, 2011
1025063 / 34180

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Abbott Medical Optics Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

I.  THE PARTIES' CLAIM CONSTRUCTION DISPUTES .................................................. 1

II.  PROCEDURAL BACKGROUND .................................................................................. 2

III.  THE '199 PATENT ..................................................................................................... 3

   A.  The Technology of the '199 Patent ................................................................. 3

   B.  The Prosecution History of the '199 Patent ..................................................... 5

   C.  The Claims ........................................................................................................ 8

IV.  ARGUMENT ............................................................................................................. 9

   A.  Applying the Proper Legal Standards for Claim Construction Compels this
        Court to Adopt AMO's Proposed Constructions ............................................. 9

   B.  Claim 5 Describes a Method Using a Continuous Wave Laser in which the
        Laser Output is Partitioned into Separate Pulses But Not Otherwise
        Fundamentally Altered .................................................................................. 10

        1.  Claim 5 requires that a continuous laser beam (*i.e.*, not laser
             pulses) interact with the target material to perform the material
             removal .................................................................................................. 10

        2.  Claim 5 requires that the continuous beam be redistributed in time
             and space to form a modified beam that has the same continuous
             characteristics as the original beam ...................................................... 12

   C.  The Beam Parameters are Manipulated *During* Operation of the Laser ............... 14

        1.  When Term 1 appears in the preamble, it is limiting ................................. 16

        2.  The proper construction of Term 1 is necessary to understand other
             claim terms ............................................................................................ 17

        3.  The claim language demonstrates that variable rate control is
             accomplished through adjusting the beam parameters *during*
             operation of the laser ............................................................................. 17

        4.  The intrinsic evidence dictates that the beam parameters are
             manipulated *during* operation of the laser ............................................ 18

D.      The "Spatial and Temporal Alteration" Element ....................................................19

      1.      The distinction between "target material" and "target region" requires that one modify just the target region, and not the entire target material ............................................................................................20

      2.      Preparing the target region by temporally or spatially varying the absorption or scattering characteristic requires introducing a substance, such as a doping agent ...............................................................21

E.      The Claimed Laser-Material Interaction Requires a Pulse Train in Which the Interaction Energy Transients Created by each Pulse Disappear Before the Next Pulse ...........................................................................................................24

      1.      "Interaction energy transients" (and decay thereof) describes a process in which a single pulse causes the temporary formation of a state of matter other than plasma that decays to modify the material .....................................................................................................25

      2.      Operating the source at a pulse repetition rate greater than 0.1 pulses per second requires multiple pulses to the same target area ...........28

      3.      Claim 5 requires that the portion of the target material containing the cumulative residual thermal energy deposited a pulse train be removed by disintegrating and ejecting (*i.e.*, ablating) in order to remove that residual energy .....................................................................29

# TABLE OF AUTHORITIES

**CASES**

*Calcar, Inc. v. Am. Honda Motor Co.,*
   2011 U.S. App. LEXIS 13083 (Fed. Cir. June 27, 2011) ...................................................... 26

*Helmsderfer v. Bobrick Washroom Equip., Inc.,*
   527 F.3d 1379 (Fed. Cir. 2008) ........................................................................................ 21

*Hologic, Inc. v. Senorx, Inc.,*
   639 F.3d 1329 (Fed. Cir. 2011) ....................................................................................... 24

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995) *(en banc)*, *aff'd* 517 U.S. 370 (1996) ........................................ 9

*Medrad, Inc. v. MRI Devices Corp.,*
   401 F.3d 1313 (Fed. Cir. 2005) .......................................................................................... 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.,*
   521 F.3d 1351 (Fed. Cir. 2008) ................................................................................... 17, 30

*Ormco Corp. v. Align Tech., Inc.,*
   498 F.3d 1307 (Fed. Cir. 2007) ....................................................................................... 16

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) *(en banc)* .................................................................. *Passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
   182 F.3d 1298 (Fed. Cir. 1999) ................................................................................... 11, 16

*Poly-America, L.P. v. GSE Lining Tech., Inc.,*
   383 F.3d 1303 (Fed. Cir. 2004) ....................................................................................... 11

*Source Search Techs., LLC v. LendingTree, LLC,*
   588 F.3d 1063 (Fed. Cir. 2009) ....................................................................................... 12

*Tillotson, Ltd. v. Walbro Corp.,*
   831 F.2d 1033 (Fed. Cir. 1987) ....................................................................................... 16

*U.S. Surgical Corp. v. Ethicon, Inc.,*
   103 F.3d 1554 (Fed. Cir. 1997) ......................................................................................... 9

*Vitronics Corp. v. Conceptronic, Inc.*
   90 F.3d 1576 (Fed. Cir. 1996) ...................................................................................... 9, 28

## I.    THE PARTIES' CLAIM CONSTRUCTION DISPUTES

In his infringement contentions, plaintiff Joseph Neev ("Neev") asserts that defendant

Abbott Medical Optics, Inc. ("AMO") is infringing seven independent claims and an additional

29 dependent claims of Neev's U.S. Patent No. 6,482,199 (the "'199 patent"). The '199 patent is

directed to a method for the variable rate removal or modification of a material (e.g., tooth

enamel) using an electromagnetic radiation beam (i.e., a laser).[1] Neev accuses AMO's

femtosecond pulse laser systems, used in corrective eye surgery, of infringement.

Substantial discussions between counsel led to agreement on the meanings of many of the

terms raised by the plethora of asserted claims, as set forth in the Joint Claim Construction

submission, D.I. 93. But there remain 16 terms on which the parties could not agree.[2] These 16

terms, in turn fall within four major categories of dispute.

First, claim 5 and its dependent claims refer to a "continuously emitting, continuous wave

(CW) beam" which is then redistributed to form separate pulses. AMO contends that proper

construction of these claim terms mandates a method in which a continuous wave of laser light is

partitioned into individual pulses without otherwise altering the continuous wave beam.

Second, the claims are directed to a method of controllable, variable-rate material

modification and removal that includes the step of operating the laser source and manipulating

the beam parameters. AMO contends that these claim terms must be interpreted together as

describing a method in which the control settings for the laser beam are adjusted *during*

*operation* in order to control and vary the rate of the material modification and removal.

---

[1] The '199 patent is submitted herewith as Ex. A. References to Ex.s are to the AMO Appendix
of Ex.s Regarding Claim Construction, filed herewith.
[2] The parties have provided a numbered list of the terms, with each variant in which they appear,
in a table attached as Ex. A to the Joint Claim Construction submission. The table is repeated as
Appendix A hereto. AMO now withdraws its objection to Neev's definition of terms numbered 6
and 7.

Third, claim 1, its dependents, and numerous additional method claims added during the reexamination of the '199 patent include an element that describes preparing the target region of the material in a particular way. AMO contends that a correct interpretation of the terms associated with this element limits these claims to methods in which the target material is treated, such as with an additive, so as to alter the absorption or scattering characteristics of the material.

Fourth, several terms relate to the impact of sequential pulses of laser light. AMO contends that, properly construed, these terms limit the claimed invention to using a series of pulses of laser energy to modify or remove material at a specific location. Each pulse delivers a threshold amount of energy; material is modified or removed during the following interval; then the next pulse arrives and the process repeats.

Neev disputes all these positions. AMO now submits the following brief in support of its proposed claim constructions.

## II.    PROCEDURAL BACKGROUND

Neev filed this action on March 5, 2009. AMO sought reexamination of the claims it believed to be relevant (claim 1 and its dependents). During reexamination, Neev amended the original claims to distinguish over the prior art. He also added new claims that he contended similarly differed from the prior art. The Patent Office allowed the amended and added claims and, on October 26, 2010, issued a Reexamination Certificate (Ex. B). The reexamination closed.

Following issuance of the Reexamination Certificate, Neev filed an amended complaint asserting infringement of claims from both the original patent (those not involved in the reexamination) and the Reexamination Certificate. AMO has answered and counterclaimed. Earlier this year, the parties exchanged infringement and invalidity contentions and have conducted some claim construction related discovery. On May 3, 2011, the parties filed their Joint Claim Construction and Pre-Hearing Statement (D.I. 93).

III.    THE '199 PATENT

A.    The Technology of the '199 Patent[3]

As noted above, the '199 patent is directed to modifying or removing targeted material

from a surface or volume using a laser beam. "Modification can include any type of permanent

changes to the target volume visco-elastic, mechanical or thermal properties." 44:52-54.[4]

Examples of permanent changes are coagulation of blood, or the evaporation of water from soft

tissue, alteration of the structure of crystals, or the partial melting of hard tissues such as tooth

enamel. 14:13-18. The patent describes removal, in contrast, as a process of "ablation" in which

the targeted matter is converted to plasma, vaporized, or disintegrated by the incident laser

energy and then ejected, leaving a void.[5] *See, e.g.,* 7:27-33; 9:35–40.

The use of lasers for such purposes was well known in the prior art. *See,* '199 patent,

"Background of the Invention," 1:27-5:37. But modifying or removing material in the desired

manner without "collateral damage" to adjacent material through thermal, acoustical, or

mechanical effects has long been problematic. 2:25-30. The purpose of the teachings of the '199

patent is to maximize the volume of the material that is removed or modified in a desired

fashion, on the one hand, compared to the volume of the material that is subject to "undesired

material modification" (*i.e.,* damaged), on the other. 5:64-67.

---

[3] The technology of the '199 patent is complex. The clients on both sides are sophisticated laser engineers and physicists, counsel have been studying the patent for more than two years, and both parties have retained experts. The Court has none of these advantages and accordingly, AMO respectfully suggests that the Court might find a technology tutorial useful.

[4] References in the form xx:yy are to column and line numbers of the '199 patent unless otherwise noted.

[5] The term "ablate" is used throughout the '199 patent to refer to the removal of some portion of the affected material by explosive ejection. *See e.g.,* 5:42 (site of removed material referred to as "ablation crater"); 5:47 (ablation process referred to as "volume removal"); 9:36 (explosive ejection of targeted material).

The patent teaches that, in order to maximize the volume of ablated material versus the volume of damaged material, each pulse of laser light that strikes the material must deposit an amount of energy (a "volumetric power density") that exceeds the threshold energy level at which ablation takes place. 5:61-6:7, 8:53-61, 9:57-10:14. Most of the energy from each pulse will then be ejected from the material with the ablation products. 7:7-18. Some of the energy, however, will remain in the material in the form of heat or mechanical or acoustical effects, and will begin diffusing or propagating through the material. By using a pulse repetition rate high enough that material is ablated and thereby removed faster than the residual energy can propagate through that very material, the propagation of this damaging residual energy is minimized. 7:19-27. In the words of the patent:

If the material processing system is allowed to operate long enough, the depth of the ablation front (or material removal) will ultimately surpass the depth of heat diffusion from the original pulses and the ablation itself will completely remove any residual heat that was deposited in the material by earlier pulse.

34:40-45. *See also* "Principles of Operation: High Ratio of Ablation Volume to Permanently Modified Volume," 20:58, *et seq.*

It is less clear what the patent teaches regarding material modification rather than removal. Each pulse has to provide enough energy to exceed the threshold volumetric power density for the desired material modification. Collateral damage is any material modification other than the desired result. The objective is to maximize the volume of material that is modified in the desired manner versus the volume that is damaged. 20:35-38. *See also* "Principles for Operation: Non-Ablative Material Modification," 42:59, *et seq.* The patent does not teach whether the rate of pulses should be higher or lower to accomplish this goal.

Whether the material is being ablated or merely modified, critical to the methods of the '199 patent requires that the energy delivered by each pulse exceed the threshold for the desired

4

result. Conversely, once that threshold energy level is met, any additional energy only increases collateral damage effects. 17:54–61.

The '199 patent includes a feedback mechanism for monitoring the effects of the laser pulses. *See* Figs. 8G, 17, and associated text at 55:16-56:13, 75:64-76:55. This mechanism conveys information from the impact site to a computer that analyzes the information to determine whether adjustments to the beam parameters need to be made during operation. The feedback mechanism consists of a detector, a computer processor, and a way to send a signal to the control unit of the beam source so that the source pulse repetition rate or other beam parameter may be adjusted for optimum performance. 75:64–77:11.

The patent also teaches the importance of the interval between pulses. The patent states that when the target volume absorbs the energy from a pulse of laser light, "interaction energy transients" are formed. The decay of these interaction energy transients causes the desired material removal or modification. 8:38, 70:37-48. To prevent pulse to pulse effects, the transients from the first pulse must have substantially decayed before the next pulse occurs. 44:10-14. Without the interval, the effect of a subsequent pulse would be masked or altered. *Id.*; 36:59-61.

The patent further teaches that there is an optimal range of pulse repetition rates that is fast enough to achieve material removal that removes the previously-deposited residual energy but slow enough to allow the prior interaction energy transient (*e.g.*, plasma) to decay before the subsequent pulse arrives: "The duration of plasma plume (on the order of a few microsecond) and the need to avoid pulse-to-pulse plasma shielding, among other things, thus dictate an operating pulse repetition rate regime between about 300 Hz and about 100,000 Hz." 36:59-64.

**B.      The Prosecution History of the '199 Patent**

The '199 patent issued from an application filed as a continuation of Application No. 09/054,834, filed April 3, 1998, now U.S. Patent No. 6,156,030 ("the '030 patent"), which claims priority to Provisional Application No. 60/050,416, filed on June 4, 1997.

The application that resulted in the '199 patent presented claims 35 through 38 from the parent application, and claims 55 through 66 of the parent application, which issued as claims 5 through 16. Ex. C, Notice of Allowability, App. No. 09/632,199, dated June 28, 2002, at 2. Claims 35 through 38 described a method of controlled, variable rate *modification* of material using a *pulsed laser*. Claims 55 through 66 described a method of performing high precision, controlled, variable rate material *removal* using a *continuous laser beam* that is "redistributed . . . in time and space" to form pulses.

In the first office action, the Examiner rejected all pending claims, stating that all of the claims were anticipated by U.S. Patent No. 5,720,894 to Neev *et al.* ("the Neev '894 patent")[6] (Ex. D). *See* Ex. E, First Office Action, App. No. 09/632,199, Mailed January 2, 2002. Neev's lawyers responded that the Neev '894 patent described an interaction mechanism that relied upon the formation of plasma. According to counsel, plasma is not an interaction energy transient, such as described in the '199 patent or covered by claim 35. Ex. F, Response to Office Action, App. No. 09/632,199, Dated April 12, 2002, at 2. The Examiner accepted this argument and explicitly relied upon the distinction in his reasons for allowance of claim 35:

Concerning independent claim 35, the examiner concedes that Neev et al. ['894 patent] neglects to explicitly disclose allowing *interaction energy transients* to substantially decay so that material modification is effected as stated in limitation c. Instead, the Neev ['894] patent discloses the generation and subsequent decay of *plasma*.

Ex. C at 2 (emphasis in the original).

---

[6] The Neev '894 patent names as inventors several individuals, including Neev, who were all then employed by the University of California. This patent is owned by the University. It is not being asserted in this action and its only relevance is as prior art to the '199 patent.

Further, Neev's lawyers disputed the application of the Neev '894 patent to claims 55

through 66, arguing that the Neev '894 patent disclosed a pulsed laser system instead of the

continuous wave beam system required by these claims. Ex. F at 4-6. Again, the examiner

agreed, stating in his reasons for allowance of that claim (Ex. E at 2-3):

Concerning independent claim 55, Neev ('894) neglects to disclose the use of a continuous wave
beam of electromagnetic radiation. Instead, Neev ['894 patent] discloses pulsed EMR
[electromagnetic radiation] application. Neev ['894 patent] discloses an oscillator and a pulse
stretcher, which actually teaches way from using a continuous wave beam.

The '199 patent issued on November 19, 2002. As originally granted, the patent included

two groups of claims: (1) independent claim 1 and its dependents claims 2 through 4,

corresponding to application claims 35 through 38, and (2) independent claim 5 and its

dependents claims 6 through 16, corresponding to application claims 55 through 66.

Soon after Neev filed this litigation, AMO initiated reexamination of claim 1 and its

dependent claim 2. (AMO did not (and does not) believe that claim 5 or its dependent claims

were relevant to any of its products.) Initially, the Patent Office found the claims in

reexamination to be invalid in light of the prior art that AMO had brought to the Patent Office's

attention. In response, Neev's lawyers submitted an amendment to claim 1 in which they added a

step to the method that they contended distinguished this claim from the prior art. That step is to

prepare the target region of the target material by "spatially or temporally varying" an absorption

or scattering characteristic of the material at the target region. Ex. G, Patent Owner's Response

to Office Action of March 12, 2010, Control No. 90/009,625, at 2. In addition, Neev's lawyers

added new claims 17 through 86, some of which are dependent upon claim 1 and some of which

are independent. *Id.* at 6–21. After a lengthy meeting between representatives of the Patent

Office, Neev, and Neev's attorneys, the amended and added claims were all allowed or

confirmed. Ex. H, Notice of Intent to Issue Ex Parte Reexamination Certificate, Control No.

90/009,625, Aug. 2, 2010, at 2; *see also* Ex. B.

### C.     The Claims

Claim 1 is repeated verbatim in Appendix B to this brief. In summary, however, claim 1

is a method claim consisting of a preamble and five separate elements. The preamble states that

the claim is a method for using pulsed laser light to modify a target material in a controlled and

variable speed manner. The interaction between the laser light and the material is characterized

by a threshold amount of energy at which the desired material modification can take place. The

five elements of the claim then step through a purported recipe for accomplishing this result.

Element (a) requires providing a source for pulsed laser light. Element (b), added in

reexamination, requires that the person performing the method prepare the material to be

irradiated in a particular manner. Element (c) describes operating the source of laser light

(presumably by turning it on) and adjusting it until the deposited energy is greater than the

threshold for material modification. Element (d) describes a pause between pulses in which the

"interaction energy transients" decay and thereby cause the material modification to occur.

Element (e) says that the method requires at least one pulse every 10 seconds until the target

volume has been modified.

Claim 5 and the other independent method claims differ in discrete specifics. For

example, as discussed above, claim 5 requires a *continuous* beam source while independent

claim 80 requires the formation of a plasma. Claims 84 through 86 are independent claims added

during the reexamination and are directed to an apparatus for performing the method rather than

the method itself but are otherwise similar.

IV.    **ARGUMENT**

    A.    **Applying the Proper Legal Standards for Claim Construction Compels this Court to Adopt AMO's Proposed Constructions**

The first step in patent analysis is determining the meaning and scope of the asserted claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996). This step—claim construction—is a question of law. *Id.*

"Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Claim construction begins with the words of the claims and claim terms are generally given their ordinary and customary meaning. *Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996). The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).

The person of ordinary skill in the art views the claim term in light of the entire intrinsic record, which includes the claims, the specification and the file history. *Id.* Thus, the claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979, *see also, Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Morposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)); *Vitronics*, 90 F.3d at 1582 (the specification "is always highly relevant to the claim

construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

In addition to the specification, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

In discerning the proper construction to be given claim terms, the court may also consult evidence external to the patent documents. *Id.* However, extrinsic evidence is viewed as "less reliable" than the patent and its file history in construing claims. *Id.* at 1318.

**B.      Claim 5 Describes a Method Using a Continuous Wave Laser in which the Laser Output is Partitioned into Separate Pulses But Not Otherwise Fundamentally Altered**

      **1.      Claim 5 requires that a continuous laser beam (*i.e.*, not laser pulses) interact with the target material to perform the material removal**

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 10 | "material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation" | This term limits the scope of the claims, even when found in the preamble. This refers to material removal by a beam of electromagnetic radiation that operates without any intervening period of zero power as it interacts with the material. | The preamble is not limiting, but to the extent the Court determines it is limiting, this term should be construed as: Material removal by a process in which continuous wave electromagnetic radiation is redistributed into pulses which interact with the material to remove the material. |
| 11 | "continuously emitted electromagnetic radiation" | Continuous electromagnetic radiation without any intervening period of zero power. | Continuously emitted electromagnetic radiation. |

The parties agree that the term "material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation" is a term that is most significant to resolution of the case. In addition, AMO believes that both terms identified above should be read in conjunction in construing these terms.

These terms appear in independent claim 5. First, the disputed term in the preamble is limiting, because it recites essential structure not found elsewhere in the claim; "a preamble is a claim limitation if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004); *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("[I]f the claim preamble is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance of the claim."). The preamble requires that the material removal be done by a continuously emitting, continuous wave beam of electromagnetic radiation, which is a structural limitation that is not explicit in the body of the claim. As such, this term is limiting even though it is found in the preamble.

Second, the parties dispute whether a continuous or pulsed beam must do the material removal. It is AMO's position that the words of the claim are clear, in that the material removal is *by* a continuously emitting, continuous wave beam, which is to say a continuous beam interacts with the material to effect material removal. Neev's proposed construction contradicts the plain meaning of the words by insisting a pulsed (rather than a continuous) beam interacts with the target material. Such a construction is inapposite to the material removal *by* a continuous beam, and so should be rejected.

Third, AMO urges the Court to clarify that a pulsed beam (which has periods of zero power that intervene between the pulses) is beyond the scope of this claim, which requires a

beam of continuously emitted electromagnetic radiation, without any intervening period of zero power. AMO seeks this non-controversial clarification to prevent Neev from trying to read this claim on a pulsed beam, wherein each pulse consists of continuous electromagnetic radiation.

### 2. Claim 5 requires that the continuous beam be redistributed in time and space to form a modified beam that has the same continuous characteristics as the original beam

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 13 | "redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses" | Partitioning the continuous wave beam to separate physical locations in the material for specific time periods with each period creating a "pulse effect" in the "modified beam" at that physical location, without changing the characteristics of the continuous wave beam of electromagnetic radiation. | Redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses. |

This term appears in independent claim 5. AMO's proposed construction appropriately limits the scope of the claim to the interpretation Neev provided during prosecution to distinguish it over prior art. *See Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) ("Claims may not be construed one way in order to obtain their allowance [in prosecution] and in a different way against accused infringers.") (citation omitted). During prosecution, Neev distinguished the '894 patent, on which he is listed as an inventor, which claimed a pulsed beam laser, as follows:

There are fundamental differences between the *Neev, et al. '894* patent system and the invention of the present application. The beam characteristics, i.e., time duration, frequency content, spatial location of frequency, and wavelength content in the beam, are not changed in the invention of the present application as they are in the *Neev, et al. '894* patent. In the invention of the present application, the spatial location of the beam at the target is changed in time to manipulate the distribution of the constant beam output at a specific place on the target, so the beam itself is never affected, only its location on the target tissue is changed. The *Neev, et al. '894* patent does not teach or even contemplate the use of a continuous wave source, let alone such a manipulation of the continuous wave beam.

Ex. F at 6. In other words, whereas the inventions claimed in '894 patent create pulses by

changing the beam's characteristics, the inventions claimed in claim 5 and its dependents in the

'199 patent only change the spatial location of the continuous beam on the target.

Neev goes on to clarify that the pulsed energy beam claimed in the '894 patent is entirely

different from the continuous wave beam claimed in the '199 patent:

The *Neev, et al,* '894 patent contemplates changing the beam energy time distribution by
stretching and then recompressing a pulse beam source. The invention of the present application,
on the other hand, redistributes a fixed, continuous wave beam, i.e., the beam always remains a
continuous wave source, which is entirely different from a pulsed energy beam. This continuous
wave beam is redistributed in both time and space at its location on the target to form at least one
modified beam comprising a plurality of pulses. In other words, the present invention achieves
pulsing not by changing the beam characteristics, but rather by constructing a system that is able
to control and change the continuous wave beam location on the target.

*Id.* Whereas the system claimed in the '894 patent produces pulses by stretching and

compressing the pulse beam source, the continuous wave beam of the '199 patent remains a

continuous wave beam, which achieves pulses by changing the location of the beam on the

target. That is to say, the beam, while continuous, appears to pulse from the perspective of any

given location on the target, as it is focused on one location of the target and then on another.

Neev further supports this construction by discussing the specific structure that the '199

continuous wave system uses to produce pulse effects:

Focusing elements, such as a hollow wave guide or articulated arm will not change the pulse
structure of the *Neev, el a.* '894 patent beam. The invention of the present application, however,
contemplates affecting pulsing of its continuous wave beam by having, for example, at least one
optical fiber and at least one hollow wave guide light conductor, so that by moving the source
output beam from one to the other, a pulse effect is created.

*Id.* at 7. By sending the continuous wave beam through a series of optical fibers that redistribute

the beam in space, the '199 system creates "pulse effects," wherein it appears on a specific

location on the target that the beam is producing pulses, without actually altering the

characteristics of the continuous beam.

This understanding of the continuous wave system claimed in the '199 patent, as defined

by AMO's proposed construction, is further underscored in the specification:

> Further, a method for high precision, highly controllable, variable rate, material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation is provided. ... The method comprises the steps of: providing a source capable of generating an output beam comprised of continuously emitted electromagnetic radiation; and redistributing the beam in time and space to form at least one modified beam. This is accomplished by repeatedly selecting a portion of the beam in time and redirecting that portion of the beam so as to define a series of pulses. In this manner, a plurality of time sequential segments of the beam are redirected, preferably through an optical fiber. Thus, a short segment of the CW beam, enough to provide the desired pulse, is diverted from the remainder of the beam.

> In effect, the beam is time sliced, such that for a given duration, a portion of the beam is directed to one optical fiber, and then for another period of time the optical beam is directed to another optical fiber. This process is repeated for a desired number of optical fibers (optimally until the entire beam is utilized) and after the beam has been directed to each of the optical fibers, the process repeats. In this manner, the beam is sequentially directed from one optical fiber to another, so as to define the desired number of separated pulsed beams. Each of the optical fibers directs the beam to a desired location where material ablation is to occur. ...

> Thus, the beam is redirected so that either a single or multiple beams are formed and such that their energy distribution at any given location on the target material forms a sequence of electromagnetic pulses.

11:8-48. In sum, both the prosecution history and the specification compel AMO's construction.

### C.     The Beam Parameters are Manipulated *During* Operation of the Laser

The preamble of each of the asserted method claims states that the method accomplishes

"controlled" or "highly controllable" "variable rate" material modification or removal. Certain of

the claims, e.g., claim 1, repeat this same language in the body of the claim. The independent

claims all further require "manipulating the beam parameters" to accomplish the desired,

controlled material modification or removal. AMO contends that these two terms (Terms 1 and 2

from the parties' Joint Claim Construction Submission) together describe a method in which the

operating settings of the laser are altered to achieve the desired results while the laser is active.

Neev, on the other hand, contends that these terms can encompass merely setting the operating

parameters of a laser while the laser is off, then turning the laser on.

AMO believes that the correct interpretation of Term 1, "controlled/highly controllable variable rate material modification/removal" is significant to resolution of the case. Both parties identify Term 2, "manipulating the beam parameters," as most significant to resolution of the case. The parties' competing terms, from the Joint Claim Construction Statement, are below.

| #[7] | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 1 | "controlled, variable rate material modification" (claim 1) | This term limits the scope of the claims, even when found in the preamble.[8] | Controlled, variable rate material modification.[9] |
| | "highly controllable, variable rate material removal" (claim 5) | This refers to a process by which material is modified or removed at a variable rate by manipulating the beam parameters while irradiating the target material. | The preamble is not limiting, but to the extent the Court determines it is limiting, this term should be construed as: Highly controllable variable rate material removal. |
| 2 | "operating the source and manipulating beam parameters" | Varying the wavelength, energy, power, spot size, focal volume, duration, or repetition rate of an electromagnetic beam while irradiating the target material. | Operating the source and setting or adjusting the beam parameters prior to or during the operation of the source. |
| | "manipulating beam parameters" | | Setting or adjusting the beam parameters prior to or during the operation of the source. |
| | "manipulating parameters of the beam" | | |
| | "adjusting characteristics of the electromagnetic radiation beam" | | |
| | "varying at least one of the following beam parameters" | | |

---

[7] References to Claim Term number are to the numbers listed in Ex. A to the parties' Joint Claim Construction and Prehearing Statement (D.I. 93).

[8] This term appears in claim 1 in both the preamble and in the claim body as part of element (d).

[9] Even though "controlled, variable rate material modification" appears in the preamble, Neev does not contest that it is limiting.

### 1.   When Term 1 appears in the preamble, it is limiting

Term 1 is found in the preamble of independent claims 1, 5, and 79 through 83.[10] While a claim preamble does not *necessarily* limit the scope of a claim, it does here, for "if the claim preamble is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance of the claim." *Pitney Bowes*, 182 F.3d at 1305.

Term 1 in the preamble of the claims is precisely what gives life, meaning, and vitality to the language that follows. The very title of the '199 patent—"Method and Apparatus for High Precision Variable Rate Material, Removal And Modification"—reveals that *variable* rate removal or modification is the focus of the invention. As discussed below, both embodiments of the claimed method taught by the specification provide for controlled, variable rate modification or removal. Furthermore, this language is required to distinguish over prior art cited against the parent application. During prosecution of the parent application, the examiner described the Muller reference as disclosing using a pulse of laser light that would "inherently increase the ratio of ablated tissue to permanently modified tissue when in use." Ex. I, Office Action, App. No. 09/054,834, dated September 20, 1999, at 4. Because Muller also disclosed using a controller to control the laser, *i.e.* controlling when it stopped/started, Neev further distinguished this reference by claiming the ability to adjust other parameters as well. Ex. J, Amendment, App. No. 09/054,834, dated February 14, 2000, at 1-3. Neev does not escape the effect of this prior art simply because it was first cited against the parent application. *See, Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1316 (Fed. Cir. 2007) ("[T]he prosecution of the [parent application], with the same specification, makes clear that the inventors understood their invention to encompass

---

[10] This term does not appear in the three independent claims to an apparatus (*i.e.*, claims 84-86). Since those terms were added during reexamination, they either must be read to incorporate this same limitation or are invalid as broader than the original claims. *See, e.g., Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 (Fed. Cir. 1987).

only [certain subject matter] because they so argued in order to distinguish their claims over [the asserted prior art]").

The language of Term 1 captures the only methods disclosed in the specification and is necessary in order to distinguish the claims from the prior art. It therefore limits even those claims where it is found only in the preamble.

### 2.    The proper construction of Term 1 is necessary to understand other claim terms

Neev contends that the plain meaning of Term 1 should suffice and no further construction is necessary. "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Such is the situation here. Term 2 is directed to manipulating, adjusting, or varying the beam parameters and is found in all claims. Manipulating the beam parameters is how the controlled and variable rate aspect of the method described by Term 1 is achieved. Accordingly, the language of Term 1 and the beam parameters manipulating language of Term 2 must be understood together. Allowing the jury simply to apply a plain and ordinary meaning to Term 1, irrespective of Term 2, would therefore result in an improper claim construction.

### 3.    The claim language demonstrates that variable rate control is accomplished through adjusting the beam parameters *during* operation of the laser

AMO's construction of Terms 1 and 2, that the control of the process is accomplished by adjusting the beam parameters *during* operation of the laser source, makes sense when one views the disputed terms in context. *See Phillips*, 415 F.3d at 1314 ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning

of those terms"). The claimed methods are to controlled *variable* rate material

modification/removal. This requires that the beam parameters vary during operation; to change

the parameters before or after operation results in *constant* rate material modification or removal

during the operation.

This simultaneity is even more express in independent claims 1 and 80 through 83. Each

of these claims include the element "operating the source and manipulating the beam

parameters . . .." In claim 1, for instance, this element reads:

operating the source and manipulating beam parameters so that a deposited volumetric power
density of the beam within a volume of the target region is greater than the threshold volumetric
power density, wherein control of the power density is achieved by varying at least one of the
following beam parameters . . .

This language unambiguously requires that operating the laser and manipulating the

beam parameters is a single step, not two different steps done at different points in time.

### 4.    The intrinsic evidence dictates that the beam parameters are manipulated *during* operation of the laser

In every instance of the specification where controlled, variable rate material

modification or removal is achieved by manipulating the beam parameters, the parameters of the

beam are manipulated at the same time the source is operating. *See*, 7:39-58 ("source is operated

and beam parameters ... are manipulated"); 8:24-37 ("source is operated and the beam

parameters manipulated ... ."); 9:21-35 ("operating the pulse source and manipulating the beam

parameters"); 9:57-10:7 ("pulse source is operated and the beam parameter is manipulated");

11:8-11, 55-60 ("source of electromagnetic energy is operated and the beam parameters are

manipulated").

Similarly, the patent discloses only two embodiments of the equipment for performing

the claimed methods. These embodiments, shown in Figures 8G and 17, both describe

adjustment of the beam parameters during operation to accomplish controlled and variable rate

material modification or removal. With respect to the embodiment shown in Figure 8G, the specification teaches monitoring the amount of material being ablated and using this information to reduce the laser repetition rate or terminate it completely. *See*, 55:56-56:2. The specification further describes using feedback mechanisms shown in Figure 17 to monitor the treatment site while the laser is in operation to ensure that an ablation interaction is occurring. If an ablation interaction is not occurring, the specification teaches increasing the pulse power, decreasing the spot size, decreasing the time scale (*i.e.*, the pulse length), or changing the wavelength of the light until ablation interaction is restored. 75:64-76:55.

There is no support for Neev's proposed construction. The specification simply does not describe manipulating the beam parameters *prior* to operation of the source, then turning the source on and operating it in a constant state. The specification nowhere describes a process in which the material is not monitored during the laser operation and the beam parameters simultaneously controlled to obtain the desired effect. The terms "highly controllable/controlled variable rate material modification/removal" and "manipulating the beam parameters" must be read together to require varying the beam parameters to control the material modification or removal during irradiation.

### D.     The "Spatial and Temporal Alteration" Element

During reexamination, Neev added the following element to the method of claim 1:

b)     preparing the target region of the material by spatially or temporally varying at least one of an absorption characteristic of the material or scattering characteristic of the material at the target region;

A "plain, ordinary meaning" of this language is not readily apparent. The parties now dispute the meaning of the "target material" (Term 4) and "target region" (Term 5), "absorption characteristic" and "scattering characteristic" (Terms 6 and 7) of the material; and finally, the overall meaning of this step of the recipe.

1.    **The distinction between "target material" and "target region" requires that one modify just the target region, and not the entire target material**

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 4 | "target material" | The entire object targeted for modification (*e.g.* tooth, cornea). | Target material. |
| 5 | "target region" | The specific, fixed location in the target material that is intended for modification by the electromagnetic beam. | Target region. |

The terms "target material" and/or "target region" are used in independent claims 1, 5, and 79–86 of the '199 patent, as well as dependent claims 10, 12, 51, 53, 61, 67, and 71. The claims clearly use these two terms to distinguish between the general object being subjected to laser treatment (the "target material") and the specific location or spot being hit by the laser (the "target region"). Neev contends that no construction of these terms is necessary. That Neev refused to join in AMO's uncontroversial definitions of these terms indicates that they harbor ambiguity and that a court construction is required.

AMO's construction of "target material" and "target region" are consistent with and required by their use in the claims. For example, in claim 1, target region is used to define two steps of the method. First, claim 1 requires: "preparing the *target region* of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or scattering characteristic of the material at the *target region.*" This expressly distinguishes between the target region and the target material of which it is a part. Second, claim 1 also requires "operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume of the material in the *target region* has been modified." This language clarifies that there are repeated laser pulses exactly to the target region.

Further, the specification confirms that, at least with respect to its use in the first of these

steps (preparing the target region), the target region is a specific, fixed location within the target

material. *E.g.*:

Making use of the same apparatus with the option to spatially and/or temporally control the
addition of "doping agents", to induce selective power deposition, precise and highly localized
material removal and/or modification can be induced at any desired location within the three-
dimensional space of the ***target region*** while substantially sparing adjacent regions of the ***target
material*** from any collateral damage. 10:67-11:7 (emphasis added).

Finally, material can be temporally and spatially prepared and/or injected with absorbing agents
at predetermined location within the three-dimensional volume of the ***target material***. 42:47-50
(emphasis added).

AMO's construction of these related terms is also supported by the testimony of the

attorney who prosecuted the reexamination of the '199 patent and drafted this claim language.

The Court may look to extrinsic evidence to help to determine what a person of ordinary skill in

the art would understand the claim term to mean, so long as such evidence does not contradict

the intrinsic record. *See Phillips*, 415 F.3d at 1319; *Helmsderfer v. Bobrick Washroom Equip.,

Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). Neev's lawyer Darryl Kinder agrees that the target

material is meant to refer to the entire object that is targeted for modification (or ablation), such

as a tooth or a cornea and that the target region is meant to refer to the specific subset of the

target material that is intended for modification. *See* Ex. K, Kinder Dep. Tr. 60:16-24.[11]

> **2.    Preparing the target region by temporally or spatially varying the
> absorption or scattering characteristic requires introducing a
> substance, such as a doping agent**

---

[11] **Q:** So your understanding at the time was the target object would be within someone's eye and
the cornea would be target material, is that your understanding?
**Kinder:** Yes, that is my understanding.
**Q:** And the target region, your understanding was that that was a subset of the cornea then, is
that right?
**Kinder:** Yes, that is my understanding.

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 8 | "preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region" | Changing the absorption or scattering characteristics of the target region by introducing a substance, such as a doping agent. | Altering the absorption or scattering characteristic of the target region of the target material in time or space, prior to irradiating the region with the electromagnetic pulses. |

The parties agree that this term is significant to resolution of the case. It appears in independent claim 1. The parties' only dispute regarding the complete claim term, as opposed to their disputes over the constituent parts of the term, is whether the means for preparing the target region is limited to introducing a substance, such as a doping agent, to the material.

During reexamination, Neev added this language as a single element, by amendment. In support, Neev cited to a number of portions of the specification. *See* Ex. G at 38–39. These portions of the specification refer only to spatially or temporally varying characteristics of the target material using doping agents, and the claimed inventions are so limited. No other means for varying characteristics of the target material are contemplated by the '199 patent.

During reexamination Neev represented to the examiner that the step of "preparing" can be done either with doping agents or mechanical means. In an examiner interview, Neev presented the following slide:



(Ex. L, Patent Owner's Statement Under 37 C.F.R. 1.560(b), Attach. B at 3.) The slide suggests that column 54, lines 50 through 59 provide support for a mechanical means to alter scattering or absorption properties of the material. This text, however, has absolutely nothing to do with preparing the target region to change its scattering or absorption properties.[12] Neev confirmed this in his deposition. He testified that this section does not relate to preparing the target region to change its scattering or absorption properties, but instead relates to modifying beam parameters. Ex. M, Transcript of the deposition of Joseph Neev, Ph.D., at 140:1–141:20, 155:24–156:16.

Not even Neev's reexamination attorney, Darrell Kinder, who prepared the above slide, could explain how this section of the specification supported his claim that the step of preparing the target region could be performed by mechanical means. When asked at his deposition how the cited portion of the specification supported a mechanical means for preparing the target region to change its scattering or absorption properties, Mr. Kinder could not recall. Ex. K at 136:14-138:2, 141:8-22. In other words, neither Neev nor his attorneys have ever been able to cite any part of the specification that supports a construction of preparing the target region to change its scattering or absorption properties other than adding a substance, such as a doping agent.[13] In these circumstances, it is appropriate to limit the scope of the claim to the disclosed embodiment. *See, Hologic, Inc. v. Senorx, Inc.*, 639 F.3d 1329, 1335 (Fed. Cir. 2011) (finding that "the specification makes clear what the inventors contemplated as their invention" when

---

[12] This text reads as follows:
"Such wavelength tunability achieved through the action of output beam modifiers **326** of FIG. *8b,* allow selection of more highly absorbed wavelengths which, in turn, increase the power density deposited within the targeted material according to the principle of operation of the present invention. The pulse output characteristics of such output wavelength tuning device will (except for shifting the wavelength) frequently be similar to those of the original input devices and can, therefore be selected to completely conform to the requirement of the present invention." ('199 patent at 54:50-59.)

"[a]ll the descriptions of the invention" were to the particular embodiment, to which the scope of the claim was properly limited).

Finally, this Court should reject any construction that attempts to broaden the claim to situations where the absorption or scattering characteristic of the entire target *material* (and not just the target region) is modified. During his deposition, Darrell Kinder—Neev's reexamination attorney and current litigation counsel—made clear that a process that affected the target object, *i.e.*, all the material rather than just the target region, did not constitute preparing the target region as required by this element (Ex. K at 127:6-12):

**Q:** So in other words, it was your understanding at the time if a process affected – in your words -- the entire target object, it did not meet temporally or spatially varying the scattering o[r] absorption characteristics of the target material, is that right?

**Kinder:** Yes, that was my understanding.

### E. The Claimed Laser-Material Interaction Requires a Pulse Train in Which the Interaction Energy Transients Created by each Pulse Disappear Before the Next Pulse

The claims of the '199 patent describe a particular interaction between the laser and the material that the laser impinges upon. That interaction is characterized by three separate phenomenon. First, the pulse creates an "interaction energy transient." Second, in the interval between the pulses, the interaction energy transient decays, thereby causing material in which it exists either to be removed or modified. Finally, the next pulse hits the target region and the process starts all over again. In one claim, rather than forming an interaction energy transient, the laser pulse creates a plasma.

Through its claim constructions, AMO provides some useful definition of these terms. In contrast, Neev's proffered definitions are largely tautological.

---

[13] Similarly, none of the citations identified by Neev to support its construction of this term provides support other than using a doping agent to prepare the target material.

1.    **"Interaction energy transients" (and decay thereof) describes a process in which a single pulse causes the temporary formation of a state of matter other than plasma that decays to modify the material**

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 3 | "interaction energy transients" | A temporary state of matter, other than plasma, that is initiated by the interaction of electromagnetic beam energy with the target. Interaction energy transients would normally include plasma, but in the application for the patent, Neev disclaimed plasma from interaction energy transient. | Energy transients in the target material that are created by interaction of electromagnetic radiation with the target material. |
| 14 | "allowing interaction energy transients caused by the electromagnetic pulses to substantially decay so that material modification is effected" | Allow(ing) the decay, via the passage of time, of an interaction energy transient, caused by the delivery of a single electromagnetic pulse to the target region, prior to subsequent irradiation, so that the material is modified. | Allowing energy transients in the target material that are created by interaction of electromagnetic radiation with the target material and caused by the electromagnetic pulses incident on the target material to substantially decay so that the material is modified while. |
|  | "allow interaction energy transients caused by the pulsed electromagnetic radiation beam to decay sufficiently such that the material can be modified" |  | Allow energy transients in the target material that are created by interaction of electromagnetic radiation with the target material and caused by the electromagnetic pulses incident on the target material to substantially decay such that the material can be modified. |
| 15 | "plasma" | A state of matter similar to a gas in which a certain portion of the particles is ionized. | Plasma. |

The parties agree that "interaction energy transients" is a term that is significant to the resolution of the case. Claim 1 and the asserted independent claims added during reexamination

refer to the decay of "interaction energy transients" (this includes claims 1 and 79–86). The term is not found in claim 5. The parties also agree that interaction energy transients are created by the interaction of electromagnetic radiation with the target material. AMO contends that interaction energy transients are a phenomenon such as a state of matter, analogous to plasma. Neev contends that interaction energy transients are a form of energy.

This distinction between matter and energy is important to both the reasons the Patent Office granted the '199 patent over the '894 patent in the first place, and now to whether the claims of the '199 patent read on the accused AMO lasers. When the Patent Office rejected the interaction energy transient claims of the '199 patent over the plasma disclosed in the '894 patent, Neev's response was not (as it is now) that interaction energy transients are a type of energy and plasma is a state of matter. Rather, he accepted this and agreed that plasma was not an interaction energy transient. As such, a construction excluding plasma from the scope of the claims is appropriate. *See Calcar, Inc. v. Am. Honda Motor Co.*, 2011 U.S. App. LEXIS 13083, at *42-43 (Fed. Cir. June 27, 2011) (affirming claim construction including negative limitation based on prosecution history).

In fact, during prosecution, the Patent Office viewed "interaction energy transients" to be a state of matter analogous to plasma, as shown by the distinction the examiner drew between the claims of the '199 patent and the plasma-based process disclosed in the Neev '894 patent:

> The applicant has successfully overcome erstwhile rejections. Concerning independent claim **35**, the examiner concedes that Neev et al. neglects to explicitly disclose allowing *interaction energy transients* to substantially decay so that material modification is effected as stated in limitation c. Instead, the Neev patent discloses the generation and subsequent decay of *plasma*.

Ex. C at 2. If "interaction energy transients" refers to transitory forms of energy, as Neev contends, it would make no sense to compare that with the plasma matter disclosed in the Neev '894 patent. Rather, the examiner would have compared the interaction energy transients to

whatever forms of energy are disclosed in that reference. Interaction energy transients must, therefore, refer to various forms of matter.

The specification of the '199 patent is silent as to the meaning of "interaction energy transients," other than to say that the "interaction energy transients caused by the electromagnetic radiation pulse are allowed to substantially decay such that material modification is effected." (*Id.* at 10:7-10.) The specification describes how the decay of plasma effects material modification in almost identical language: "The plasma is preferably allowed to decay such that a layer of the material is removed and substantially most of the material radiation pulse energy deposited in the material is removed with the layer." (*Id.* at 9:49-52.) Because of this parallel discussion of decay resulting in material modification (which, in the case of plasma, is material removal), AMO interprets "interaction energy transients" to mean a state of matter analogous to a plasma, the decay of which results in material modification.

Finally, the plain meaning of the phrase precludes the interpretation Neev advances. The parties agree that "interaction energy transients" arise from the interaction of the energy of the laser beam with the target material. "Transient" is both an adjective and a noun. If the drafter had intended to describe a transient form of energy arising from that interaction, she would have used the phraseology "transient interaction energy," such that the adjectives "transient" and "interaction" modified the noun "energy."

Term 15 ("plasma") is important to distinguish from interaction energy transients, but also appears in independent claim 80, as well as dependent claims 21, 22, and 25. Even though Neev specifically distinguished his original claims over the Neev '894 patent on the grounds that the Neev '894 patent relied upon the formation and decay of plasma, nonetheless, Neev has attempted to recapture plasma mediated processes through his proposed construction, which

27

should therefore be rejected. The Court may "rely on dictionary definitions when construing

claim terms, so long as the dictionary definition does not contradict any definition found in or

ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322-23 (*quoting*

*Vitronics*, 90 F.3d at 1584 n.6). AMO's proposed construction is intended to provide clarity and

is copied from the Wikipedia entry for plasma. Ex. N, Plasma (physics), Wikipedia,

http://en.wikipedia.org/wiki/Plasma_(physics) (last visited August 22, 2011).

### 2. Operating the source at a pulse repetition rate greater than 0.1 pulses per second requires multiple pulses to the same target area

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 9 | "operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified" | Firing multiple electromagnetic pulses at a rate greater than one pulse every ten seconds at the same target region until a desired volume within that target region has been modified. | Operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified. |

AMO believes that construction of this term will assist in resolution of the case. This

term appears in independent claims 1, 79–80, 82, and 83. AMO's proposed construction merely

clarifies that this limitation requires that, in order to modify the target region, more than one

pulse must interact with the same target region. This is consistent with the specification's

description of why an operator would want to utilize a high pulse repetition rate. Indeed, this

concept is fundamental to the '199 invention:

The inventor recognized that the deposition of large number of pulses within a short time duration, which corresponds to high pulse repetition rate, is only possible because of the condition which the present invention imposes on the interaction, namely, that most of the energy deposited by a single pulse will be removed by the ablation products ejected from the material due to the action of the very same pulse.

21:26-44. At bottom, Neev's invention only makes sense if multiple pulses are deposited in the

same area at a rapid rate. As such, this Court should restrict the scope of the claims to Neev's

fundamental invention and require that multiple pulses be fired at the same target region, as proposed by AMO's construction.

> **3.     Claim 5 requires that the portion of the target material containing the cumulative residual thermal energy deposited a pulse train be removed by disintegrating and ejecting (*i.e.*, ablating) in order to remove that residual energy**

| # | Claim Term | AMO's Construction | Neev's Construction |
|---|---|---|---|
| 16 | **"cumulative residual thermal energy left in the material by a pulse train"** | A "pulse train" is the delivery of multiple exposures of electromagnetic radiation to the same target region in the target material. "Cumulative residual thermal energy left in the material by a pulse train" refers to the residual thermal energy that builds up at a particular target region in the target material after multiple exposures of EM radiation by the pulse train each depositing a certain amount of residual thermal energy. | Remaining accumulated thermal energy left in the target material by a pulse train. |
| 12 | **"material ablation"** | Complete material disintegration and explosive ejection of the target volume. | Material ablation. |

AMO's construction of Term 16 adopts the ordinary meaning of the disputed claim term, while Neev's construction leaves open the possibility that a pulse train could consist of only one pulse. It is clear from the plain meaning of "train" as well as the claim's use of the word "cumulative" that a pulse train requires more than one pulse of electromagnetic radiation. Additionally, every time the specification uses the term "pulse train," it is in conjunction with a fast pulse repetition rate, which implies multiple pulses, *e.g.*: "Employing a pulse repetition rate of sufficiently large value ensures that most of the residual cumulative pulse train energy left in the material is removed by cumulative ablative effect of the rapidly moving ablation front." ('199 at 19:32-36.) As such, this Court should adopt AMO's proposal.

AMO's proposed construction of Term 12 comes straight from the language of the specification: "Preferably, the electromagnetic energies absorbed by the material to complete the material disintegration and explosive ejection of the targeted material deposition volume, so that substantially most of the deposited energy is removed from the target material with the ejected portion of the material." 9:35-41. Neev contends that the term needs no construction, but the plain and ordinary meaning of material ablation is inadequate, as it does not resolve the parties' dispute. *See, O2 Micro*, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."). As such, the Court should construe this claim.

The '199 patent makes clear that ablation requires ejection of the target volume for the '199 invention to function (21:26-44 (emphasis added)):

The practice of the present invention maximizes deposition of the incoming radiation within the area targeted for ablation or alteration, and minimizes deposition or further transport of the energy to adjacent region thus minimizing the depth of the zone of matter which has been permanently modified. Moreover, the inventor realized that if most of the deposited energy is removed wi[t]h the ejected debris, very little energy is left within targeted material, thus *allowing a large number of pulses to be deposited within the same area of the targeted material within a short time duration.*

If the target volume is not ejected from the target material, the deposited energy would remain in the target material, which would negate the process of the '199 invention. Said another way, the '199 invention can only function if the deposited energy is removed with the ejected material during the ablation process. As such, this Court should adopt AMO's construction.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

A. James Isbester
David B. Perry
Jessica L. Hannah
KILPATRICK TOWNSEND
  & STOCKTON LLP
Two Embarcadero Center, Eighth Floor
San Francisco, CA  94111
Tel:  (415) 576-0200

Dated:  August 23, 2011
1025063 / 34180

By:  */s/ Richard L. Horwitz*     
     Richard L. Horwitz (#2246)
     David E. Moore (#3983)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE 19801
     Tel:  (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Defendant*
*Abbott Medical Optics Inc.*

31

## APPENDIX A

## Summary of Disputed Claim Terms

| # | Claim Term | Recited in or Required by Claims | Neev | | AMO | |
|---|---|---|---|---|---|---|
| | | | Proposed Construction | Supporting Evidence | Proposed Construction | Supporting Evidence |
| 1 | "controlled, variable rate material modification" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | Controlled, variable rate material modification. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | This term limits the scope of the claims, even when found in the preamble. This refers to a process by which material is modified or removed at a variable rate by manipulating the beam parameters while irradiating the target material. | '199 patent at 33:23-40:24, 42:59-45:33. Neev depo. at 113:16-114:3. Kinder depo. at 32:17-21. |
| | "highly controllable, variable rate material removal" | 5, 6, 7, 10-15 | The preamble is not limiting, but to the extent the Court determines it is limiting, this term should be construed as: Highly controllable variable rate material removal. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | | |
| 2 | "operating the source and manipulating the beam parameters" | 1, 2, **20**, **21**, 22, **23**, 25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | Operating the source and setting or adjusting the beam parameters prior to or during the operation of the source. | The '199 patent at, for example, col. 45, ll. 36-43; col. 48, ll. 43-45. | Varying the wavelength, energy, power, spot size, focal volume, duration, or repetition rate of an electromagnetic beam while irradiating the target material. | '199 patent at 33:23-40:24, 42:59-45:33, 54:36-59. Neev depo. at 140:25-141:15. Kinder depo. at 46:17-47:2. |
| | "manipulating beam parameters" | 1, 2, **20**, **21**, 22, **23**, 25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | Setting or adjusting the beam parameters prior to or during the operation of the source. | The '199 patent at, for example, col. 3, ll. 27-37; col. 11, ll. 55-60; col. 17, l. 62 - col. 18, l. 7; col. 20, ll. 5-16; col. 43, ll. 34-44; col. 48, ll. 43-45. | | |
| | "manipulating parameters of the beam" | 5, 6, 7, 10-15 | | | | |
| | "adjusting characteristics of the electromagnetic radiation beam" | **85, 86** | | | | |

1

| # | Claim Term | Recited in or Required by Claims | Neev | | AMO | |
|---|---|---|---|---|---|---|
| | | | Proposed Construction | Supporting Evidence | Proposed Construction | Supporting Evidence |
| | "varying at least one of the following beam parameters" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | | | | |
| 3 | "interaction energy transients" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83**, 85, 86 | Energy transients in the target material that are created by interaction of electromagnetic radiation with the target material. | The '199 patent at, for example, col. 22, ll. 38-44 and col. 58, ll. 12-20. *See also* Section III(B) of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. | A temporary state of matter, other than plasma, that is initiated by the interaction of electromagnetic beam energy with the target. Interaction energy transients would normally include plasma, but in the application for the patent, Neev disclaimed plasma from interaction energy transient | '199 patent at, for example, col. 22, ll. 38-44 and col. 58, ll. 12-20. *See also* Serial No. 09/632,199, Reasons for Allowance, June 28, 2002. Neev depo at 143:6-144:10; 150:2-7. Kinder depo. at 75:1-13. |
| 4 | "target material" | 1, 2, **5, 6, 7, 10, 11**, 12, 13, 14, 15, 20-25, 27, 28, 30, 34, 50-52, **53, 54, 61**, **67, 71, 77, 80-83**, 85, 86 | Target material. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | The entire object targeted for modification (e.g. tooth, cornea). | Neev depo. at 114:13-115:2. Kinder depo. at 58:21-60:24. |
| 5 | "target region" | 1, 2, 20-25, 27, 28, 30, 34, 50, **51, 52**, **53, 54, 61, 67, 71**, 77, **80-83, 85, 86** | Target region. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | The specific, fixed location in the target material that is intended for modification by the electromagnetic beam. | Neev depo. at 115:24-116:1. Kinder depo. at 58:21-60:24. |
| 6 | "absorption characteristic of the material ... at the target region" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | A characteristic of the target material that determines the absorption of the electromagnetic | The '199 patent at, for example, col. 10, ll. 5-7; col. 23, ll. 38-40; col. 29, l. 62 - col. | A property of the target material that governs how the target region converts | The '199 patent at, for example, col. 40:26-42:58. *See also* Sections IV of |

2

| # | Claim Term | Recited in or Required by Claims | Neev | | AMO | |
|---|---|---|---|---|---|---|
| | | | Proposed Construction | Supporting Evidence | Proposed Construction | Supporting Evidence |
| | "absorption of the target region" | 85, 86 | energy by the target material at the target region. | 30, ll. 17; col. 41, ll. 5-14; col. 43, ll. 56-65 | electromagnetic energy to energy absorbed by the target region. | the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. Neev depo. at 122:14–21. Kinder depo. at 109:9–14. |
| 7 | "scattering characteristic of the target material at the target region" "scattering of the target region" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** 85, **86** | A characteristic of the target material that determines the scattering of the electromagnetic energy by the target material at the target region. | The '199 patent at, for example, col. 10, ll. 5-7; col. 23, ll. 38-40; col. 43, ll. 56-65 | A property of the target material that governs how the target region redistributes light as it propagates through the target region. | The '199 patent at, for example, col. 40:26-42:58. *See also* Sections IV of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. Kinder depo. at 110:5-11 |

| # | Claim Term | Recited in or Required by Claims | Neev | | AMO | |
|---|---|---|---|---|---|---|
| | | | Proposed Construction | Supporting Evidence | Proposed Construction | Supporting Evidence |
| 8 | "preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77 | Altering the absorption or scattering characteristic of the target region of the target material in time or space, prior to irradiating the region with the electromagnetic pulses. | The '199 patent at, for example, col. 9, ll. 31-35; col. 10, ll. 21-25; col. 20, ll. 7-12; col. 38, l. 63 - col. 39, l. 9; col. 41, ll. 40-61; col. 42, ll. 46-57; col. 43, ll. 56-65; col. 45, ll. 22-33. See also Section IV(A)(2) of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. | Changing the absorption or scattering characteristics of the target region by introducing a substance, such as a doping agent. | The '199 patent at, for example, col. 40:26-42:58. See also Section IV of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. Neev depo. 151:9-18; 153:18-155:13. Kinder depo. 140:6-141:22. |
| 9 | "operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | Operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume in the target region has been modified. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | Firing multiple electromagnetic pulses at a rate greater than one pulse every ten seconds at the same target region until a desired volume within that target region has been modified. | '199 patent at 33:23-40:24. |
| 10 | "material removal by a continuously emitting, continuous wave (CW) beam of electromagnetic radiation" | 5-7 and 10-15 | The preamble is not limiting, but to the extent the Court determines it is limiting, this term should be construed as: Material removal by a process in which continuous wave electromagnetic radiation is redistributed into pulses which interact with the material to remove the material. | The '199 patent at, for example, col. 11, ll. 45-54; col. 49, ll. 5-16 and 27-41; col. 52, ll. 56-61; col. 78, ll. 17-19. | This term limits the scope of the claims, even when found in the preamble. This refers to material removal by a beam of electromagnetic radiation that operates without any intervening period of zero power as it interacts with the material. | '199 patent at, e.g., col. 11:8-13:61, 13:10-37, 49: 42-57:40 See also Serial No. 09/632,199, Resp. to Office Action, April 12, 2002, at 5-7. |

4

| # | Claim Term | Recited in or Required by Claims | Neev Proposed Construction | Neev Supporting Evidence | AMO Proposed Construction | AMO Supporting Evidence |
|---|---|---|---|---|---|---|
| 11 | "continuously emitted electromagnetic radiation" | 5-7 and 10-15 | Continuously emitted electromagnetic radiation. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | continuous EM radiation without any intervening period of zero power | The '199 patent at, for example, col. 49, ll. 5-16 and 27-41. |
| 12 | "material ablation" | 5-7, 10-15 | Material ablation | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | Complete material disintegration and explosive ejection of the target volume. | The '199 patent at, e.g., 9:35-40. |
| 13 | "redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses" | 5-7, 10-15 | Redistributing the beam in time and space to form at least one modified beam comprising a plurality of pulses. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words | Partitioning the continuous wave beam to separate physical locations in the material for specific time periods with each period creating a "pulse effect" in the "modified beam" at that physical location, without changing the characteristics of the continuous wave beam of electromagnetic radiation. | '199 patent at, e.g., col. 11:8-13:61, 13:10-37, 49: 42-57:40 See also Serial No. 09/632,199, Resp. to Office Action, April 12, 2002, at 5-7. |
| 14 | "allowing interaction energy transients caused by the electromagnetic pulses to substantially decay so that material modification is effected" | 1, 2, 20-25, 27, 28, 30, 34, 50-54, 61, 67, 71, 77, **80-83** | Allowing energy transients in the target material that are caused by interaction of electromagnetic radiation with the target material and caused by the electromagnetic pulses incident on the target material to substantially decay so that the material is modified while. | The '199 patent, col. 40, for example, col. 40, ll. 13-24; col. 44, ll. 10-16; col. 71, ll. 5-32. See also Section III(C) of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. | Allow(ing) the decay, via the passage of time, of an interaction energy transient, caused by the delivery of a single electromagnetic pulse to the target region, prior to subsequent irradiation, so that the material is modified. | The '199 patent at, for example, col. 40, ll. 13-24; col. 44, ll. 10-16; col. 71, ll. 5-32. See also Section III(C) of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. |

5

| # | Claim Term | Recited in or Required by Claims | Neev | | AMO | |
|---|---|---|---|---|---|---|
| | | | Proposed Construction | Supporting Evidence | Proposed Construction | Supporting Evidence |
| | "allow interaction energy transients caused by the pulsed electromagnetic radiation beam to decay sufficiently such that the material can be modified" | 85, 86 | Allow energy transients in the target material that are created by interaction of electromagnetic radiation with the target material and caused by the electromagnetic pulses incident on the target material to substantially decay substantially decay such that the material can be modified. | The '199 patent at, for example, col. 40, ll. 13-24; col. 44, ll. 10-16; col. 71, ll. 5-32. *See also* Section III(C) of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. | | The '199 patent at, for example, c col. 40, ll. 13-24; col. 44, ll. 10-16; col. 71, ll. 5-32. *See also* Section III(C) of the Patent Owner's Response to Office Action of March 12, 2010, filed in Control No. 90/009,625, filed on June 14, 2010. |
| 15 | "plasma" | 21, 22, 25, 80 | Plasma. | This claim term would not benefit from construction. The meaning is clear from the plain meaning of the words. | A state of matter similar to a gas in which a certain portion of the particles is ionized. | [None identified] |

6

| # | Claim Term | Recited in or Required by Claims | New | | AMO | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Proposed Construction | Supporting Evidence | Proposed Construction | Supporting Evidence |
| 16 | "cumulative residual thermal energy left in the material by a pulse train" | 5-7, 10-15 | Remaining accumulated thermal energy left in the target material by a pulse train. | The '199 patent at, for example, col. 11, l. 66 - col. 12, l. 9; col. 18, l. 65 - col. 19, l. 7; col. 37, ll. 9-20; col. 38, ll. 7-17; col. 53, ll. 3-16, 46-62. | "Thermal energy" means energy from the electromagnetic radiation that was converted to heat energy resulting in a temperature increase.<br><br>A "pulse train" is the delivery of multiple exposures of EM radiation to the same target region in the target material.<br><br>"Cumulative residual thermal energy left in the material by a pulse train" refers to the residual thermal energy that builds up at a particular target region in the target material after multiple exposures of EM radiation by the pulse train each depositing a certain amount of residual thermal energy. | '199 patent at 20:58-31:24, 33:23-40:24, 42:59-45:33. |

## APPENDIX B

### Claim 1 of the '199 Patent (As Amended in Reexamination)

A method for a controlled, variable rate material modification by a pulsed electromagnetic radiation beam irradiated on a target region of a target material, interactions between the pulsed electromagnetic radiation beam and the material providing a modification threshold volumetric power density, the method comprising:

a) providing a source capable of generating an output beam comprised of a sequence of electromagnetic pulses, each electronicmagnetic pulse having a pulse duration in a range of approximately 1 femtosecond to approximately 100 millisecond;

b) preparing the target region of the target material by spatially or temporally varying at least one of an absorption characteristic of the material or a scattering characteristic of the material at the target region;

c) operating the source and manipulating beam parameters so that a deposited volumetric power density of the beam within a volume of the target region is greater than the threshold volumetric power density, wherein control of the power density is achieved by varying at least one of the following beam parameters:

> a beam spot size at the target region, a duration of the electromagnetic pulses, an energy of the electromagnetic pulses, or a wavelength of the electromagnetic pulses,;

d) allowing interaction energy transients caused by the electromagnetic pulses to substantially decay so that material modification is effected permitting the controlled, variable rate material modification, the material modification including at least one of the following material modifications:

> chemical changes of the material, physical changes of the material, changes to viscoelastic properties of the material, changes to optical properties of the material, thermal properties of the material, chemical and physical breakdown of the material, disintegration of the material, ablation of the material, melting of the material and vaporization of the material;

e) operating the source at a pulse repetition rate greater than 0.1 pulses per second until a target volume of the material in the target region has been modified.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on August 23, 2011, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on August 23, 2011, the attached document was Electronically Mailed to the following person(s):

Richard K. Herrmann
Mary B. Matterer
Amy A. Quinlan
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
rherrmann@morrisjames.com
mmatterer@morrisjames.com
aquinlan@morrisjames.com

Kenneth G. Parker
Haynes and Boone, LLP
18100 Von Karman, Suite 750
Irvine, CA 92612
Kenneth.Parker@haynesboone.com

Don Tiller
Theodore G. Baroody
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Don.Tiller@haynesboone.com
Ted.Baroody@haynesboone.com

Darrell D. Kinder
Haynes and Boone, LLP
2033 Gateway Place, Suite 400
San Jose, CA 95110
Darrell.kinder@haynesboone.com

By:  /s/ Richard L. Horwitz
     Richard L. Horwitz
     David E. Moore
     POTTER ANDERSON & CORROON LLP
     (302) 984-6000
     rhorwitz@potteranderson.com
     dmoore@potteranderson.com

910488 / 34180